John Miller Electric Company, Inc. v. Commissioner.
John Miller Elec. Co. v. Commissioner
Docket No. 4253.
United States Tax Court
1945 Tax Ct. Memo LEXIS 34; 4 T.C.M. (CCH) 1023; T.C.M. (RIA) 45345; November 26, 1945
*34 Thomas M. Wilkins, Esq., for the petitioner. Thomas F. Callahan, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: For the year 1941, respondent determined deficiencies in income tax, declared value excess profits tax, and excess profits tax liability in the amounts, respectively, of $12,611.62, $3,406.29, and $40,682.65. For the year 1942, respondent determined that there was an overassessment of $2,369.94 in income tax liability, and that there was a deficiency of $13,680.69 in excess profits tax liability. Petitioner does not contest certain adjustments, but it contends that respondent erred in holding that a reasonable allowance for compensation of petitioner's president for the years 1941 and 1942 is $60,000 for purposes of business expense deductions under section 23(a)(1)(A) of the Internal Revenue Code, as amended. Respondent disallowed deductions for compensation of its president to the extent of $76,504.58 in 1941, and $5,279.16 in 1942. The only question is what amount constitutes a reasonable allowance for compensation of petitioner's president in the taxable years. Petitioner filed its returns *35 with the collector for the district of Michigan. Findings of Fact Petitioner, a Michigan corporation, was organized on November 26, 1940, and has its office in Detroit. The issued capital stock, 1,000 shares, is owned by Charles D. Pierce, president, by his wife, and by his four children, except for qualifying shares owned by directors. Pierce owns 20 percent of the stock, his wife owns 20 percent, and his children own 60 percent. Petitioner was organized by Pierce to carry on the electrical contracting business. Pierce was given the right to use the name "John Miller Electric Company" by John Miller with whom Pierce had been associated since 1908, first as an employee, and later, as manager of a business conducted under the above name. In 1940, Miller retired from business completely. When petitioner was organized, it took over the business of John Miller Electric Company, and continued the business without interruption, so that few people understood that there had been any change effected by the organization of a corporation having the same name. Pierce had been the manager and the dominant force in the business since 1925, when John Miller became inactive. He had obtained the *36 business of the Miller Electric Company for about twenty years, and clients knew him rather than Miller. When the petitioner corporation was organized, Pierce became president, Carl Binkle became vice-president, and N. E. Vollrath and E. J. Walsh became treasurer and secretary, respectively. Binkle had been auditor and bookkeeper for the business for about fifteen years, and Vollrath and Walsh had been employed in the business for thirty and fifteen years respectively. After petitioner was organized, and during the taxable years, Pierce served petitioner in exactly the same capacities and to the same extent as he had served the Miller Electric Company for many years, as far back as 1925 when he became manager. During the taxable years, pierce devoted all of his time to the business of petitioner. He served petitioner in several capacities: He was the manager; he solicited and obtained business; he supervised the work of estimating jobs; he closed contracts; he supervised the work being done under contracts. The business of petitioner is electrical contracting. Petitioner is a contractor. Its earnings depend upon obtaining contracts under terms which, with good and efficient management, *37 will yield income. The electrical contracting business is highly competitive. In most of the competing concerns, several salesmen are employed to obtain business. Pierce was the only person engaged in obtaining business for petitioner. Petitioner had no other salesmen or persons who negotiated contracts. His compensation for all of his services to petitioner was established by petitioner's board of directors at meetings held on February 11, 1941 and March 4, 1942, to be 45 percent of net earnings before all Federal taxes for the years 1941 and 1942. The compensation which Pierce received for his services to petitioner was $136,504.58 for 1941, and $65,279.16 for 1942. The net profit earned by petitioner in 1941 and 1942, before allowing for Pierce's compensation, was $30,343.52, and $145,064.79. The electrical contracting business which was carried on by petitioner, and which had been carried on by the Miller Electric Company prior to the incorporation of petitioner, consisted of installing the electric wiring and equipment in plants and buildings in the course of construction. Usually the contracts for such work provide that the electrical contractor shall be paid a fixed fee or *38 a percentage of the total cost. Acquaintance with builders, engineers, and with representatives of industrial concerns is a prime requisite of obtaining such business. From 1925, forward, Pierce had solicited business for Miller Electric Company. He was known in the business as one of the most successful managers and contractors. Petitioner, in 1941 and 1942, ranked as one of the largest electrical contracting concerns in the United States. Pierce had built up excellent contracts during his many years in the business. In 1941 he was the successful bidder and received the contract to install the electrical system in the Ford Willow Run bomber plant at Ypsilanti, Michigan, near Detroit. That contract involved expenditures of about fourteen million dollars and was one of the largest electric contract jobs which has ever been undertaken in the United States, if not the largest. Many contractors sought the contract. Petitioner was one of three concerns having a good chance to obtain the contract. Through the work and efforts of Pierce, petitioner succeeded in obtaining the contract. During 1941 and 1942, Pierce obtained contracts for petitioner from General Motors, Dodge, Packard, Allison *39 Motors and Yellow Cab corporations. Work under these contracts was done in 1941 and 1942, but the work was not completed in these years under all of the contracts. The contract with Allison Motors involved a total cost of three and a half million dollars. The contract with Packard was for about five hundred thousand dollars. A contract to do work at the Ford River Rouge plant involved costs of over a million dollars. Petitioner, as a contractor, employs labor and purchases materials. It reports its income on the basis of percentage of completion of contracts during a year. Gross receipts and gross costs are reported. The difference constitutes petitioner's gross earnings under contracts. The net income received by petitioner under contracts and from other sources in 1941 and 1942 was as follows: 1941
1942
Gross sales
$4,555,514.05
$9,725,080.86
Costs
4,028,468.00
9,448,731.92
Gross Profits
$527,046.05
$276,348.94
Income from Other Sources
6,751.95
37,974.56
Gross Income
$533,798.00
$314,323.50
The business of petitioner depends upon the personal services and skill of Pierce. His efforts determine the size of petitioner's *40 business. Petitioner has no plant. It has a small permanent staff consisting of five or six office employees, a purchasing agent, from two to eight estimators, from two to ten buyers of materials, and from fifteen to twenty engineers. The general office of petitioner consists of a suite of three rooms. It has, also, a warehouse and an office for estimators and engineers. The number of employees depends upon the volume of work. The sums paid to Pierce during 1941 and 1942 by petitioner were paid to him for services he rendered to petitioner, and not for any other purpose. In 1940, before Pierce organized petitioner, Henry F. Fischbach, president of Fischbach and Moore, Inc., an electric contracting concern, offered Pierce an opportunity to become associated with that concern. The proposal was that Pierce open an office in Detroit for Fischbach and Moore, as manager and business solicitor. Fischbach offered Pierce, as compensation, $52,000 a year, plus ten percent of the profits earned under contracts which he obtained, or a straight fifty percent of all profits earned. The Fischbach concern employs a business solicitor on the Pacific coast on the basis of fifty percent of profits. *41 Pierce refused the offer because he preferred establishing his own business, and he proceeded to organize petitioner. Petitioner did not declare dividends upon its stock in 1941 and 1942. It declared dividends in 1942 and 1944. Petitioner continued to compensate Pierce for his services at the rate of 45 percent of net profit in 1943 and 1944, and paid him in those years $29,868.46 and $13,800.19, respectively. During most of the years Pierce was associated with Miller in the Miller Electric Company there was an employment contract. In 1925, Pierce received $40,000 a year from Miller Electric Company. In 1926, Pierce accepted a long-term employment contract under which his compensation was fixed on the percentage basis, starting with compensation of 25 percent of net profits, and increasing 5 percent each year to 45 percent. Pierce agreed to contribute to losses at the same percentage rates. Pierce was receiving compensation on the basis of 45 percent of profits in 1930. In 1935, Pierce requested Miller to make a new contract, and Miller complied. Under the new contract all profits and losses of the Miller Electric Company were to be divided in the proportion of 55 percent to *42 Miller, and 45 percent to The Pierce Company, Inc., a corporation organized by Pierce to be his corporate alter ego. Respondent regarded this agreement as constituting an agreement of partnership between Pierce and Miller, and held that a partnership existed from 1935 until the business of Miller Electric Company was terminated in 1940. The compensation for services paid to Pierce by Miller Electric Company on the basis of an agreed percentage of profits, from 1925 to 1940 was as follows: Year
Compensation
1925
$ 40,000.00
1926
90,657.57
1927
74,511.80
1928
114,878.28
1929
104,387.82
1930
57,843.36
1931
52,605.89
1932
8,446.24
(loss)
1933
883.60
1934
40,514.91
1935
197,178.32
1936
147,496.77
1937
58,943.90
1938
8,003.61
(loss)
1939
9,070.43
(loss)
1940
9,173.80
(loss)
A reasonable allowance for compensation for the personal services of Pierce rendered to petitioner in 1941 and 1942 is $136,504.58 for 1941, and $65,279.16 for 1942. Opinion The question is whether any part of the compensation paid to Charles D. Pierce, petitioner's president, business solicitor, and general manager, in the taxable years is in excess of a *43 reasonable allowance for compensation for services actually rendered. Respondent points out that petitioner's stock is owned by members of Pierce's family, and a contention is made that Pierce was in a position to dictate the amount of salary he should receive. Thus, respondent argues that his compensation was not fixed pursuant to "free bargaining" between petitioner and Pierce. Respondent contends that $60,000 a year is a reasonable allowance for Pierce's salary in each year. He contends, further, that the compensation which was paid to Pierce by Miller Electric Company in prior years is not a criterion for determining the reasonableness of an allowance to petitioner corporation for Pierce's compensation. Pierce has been engaged in the electric contracting business as a manager of a business since 1925, after having worked in the business in various capacities since 1908. He is a practical engineer. We are concerned in this case only with his services for petitioner corporation, but it would be unreasonable not to give consideration to his prior experience and services while he was associated with the Miller Electric Company, particularly since there was continuity in the business *44 operations. Pierce had built up the business of the former concern. The contacts he had were of great value. Indeed he represented the good will and reputation of the business while it was operated as an unincorporated business, as well as afterward. When, in 1941 the war needs engendered electric engineering contracts of great size, Pierce was one of the outstanding men in the field, and he was successful in bringing very profitable business to petitioner in the taxable years. He is the only person who obtains business for petitioner, and he, alone, is responsible for its profits. He supervised every phase of petitioner's business. His services were varied and essential. It cannot be disputed that Pierce's ability is of a high order. Henry F. Fischbach, president of Fischbach and Moore, Inc., electric contractors, was asked what he thought of Pierce's ability. His reply was as follows: I think Charlie Pierce is considered the topnotch [salesman for electrical contractors in the United States], or close by. The salary of Pierce was fixed by petitioner's directors at 45 percent of net earnings. The testimony of Fischbach shows that compensation for salesmen in the electric contracting *45 business is often determined on the basis of a percentage of profits from contracts, and that the percentage is as high as 50 percent. In fact, Fischbach had offered Pierce a contract of employment under which Pierce would receive 50 percent of profits from business which he obtained. Respondent's argument that the agreement between petitioner and Pierce was not an arms-length agreement, is not entitled to very much consideration in the light of Fischbach's testimony. A concern in which Pierce did not exercise great control would have entered into an employment contract with Pierce on the same, and slightly better terms, than petitioner did. It is recognized that the method of fixing compensation with reference to profits realized from the efforts of the employee carries business-getting incentives, and is a fair way of making compensation for services proportionate to the results of the services. See William S. Gray and Co., v. United States, 35 Fed. (2d) 968, 975, where it was said: What may be an ordinary and necessary expense for salary in a given corporation may vary from year to year, the variance being controlled by the fluctuating conditions of business generally *46 and of the business itself and the management. * * * See also, J. D. Van Hooser & Co. v. Glenn, 50 Fed. Supp. 279, 285, where it was said: The policy of agreeing to pay a percentage of earnings before they are earned, or even a lump sum in the nature of a bonus after they are earned, is based primarily upon sound business principles. Respondent questions the entire arrangement under which petitioner's compensation was fixed at 45 percent of earnings on the ground that prior to the organization of petitioner, there was a partnership or a joint venture conducted by Pierce and Miller under the name of John Miller Electric Company. There is not conclusive proof that that business was conducted as a partnership, but if it was, the arrangement was made as late as 1935, and for several years prior Pierce had been paid a salary on the basis of a percentage of earnings of the business, which was as high as 45 percent in 1930. If there was a partnership from 1935 to 1940, a point which is not in issue under the pleadings, and which we do not decide, that would seem to be immaterial because Pierce's compensation from Miller Electric Company had been fixed at 45 percent of profits *47 for several years prior to 1935. If respondent is contending here that the amounts paid to Pierce in the taxable years by petitioner represented more than compensation for services, and included a distribution of dividends in the guise of salary, his argument is not clearly directed to that point. Respondent's argument appears to be, rather, that if there was a partnership before petitioner was organized, under which Pierce shared profits and losses at the rate of 45 percent, such fact would indicate that the agreement between petitioner and Pierce was not a bona fide agreement to pay Pierce a salary for his services, but was an agreement to distribute earnings to him without reference to the value of his services. The evidence does not support such theory in this case. It is concluded that the contract which was made between Pierce and Miller in 1935, does not derogate from the claim of petitioner that it is entitled to the deductions herein claimed. The only question before us is whether the payments of Pierce's compensation in 1941 and 1942 in the amounts of $136,504.58 and $65,279.16 were in excess of reasonable compensation for services actually rendered to petitioner in those *48 years. We think they were not, upon careful consideration of the entire record. It is held that no part of the compensation paid to Pierce in 1941 and 1942 was in excess of reasonable compensation for services rendered to petitioner in those years. Decision will be entered under Rule 50